We're going to hear 18-9011, Reserve Mechanical Corporation v. Commissioner of Internal Revenue. Mr. Albright, are you ready to proceed? I notice you're muted right now. Mr. Albright, you're muted. Ah, good. Can you hear me, Your Honor? Yes, yes. Please proceed. May it please the Court, I'm Ben Albright, appearing on behalf of Reserve, the appellant in this case. I would like to reserve three minutes for rebuttal. The central issue in this appeal is whether the tax court erred in holding that Reserve was not an insurance company for tax purposes. As indicated by the amicus brief filed in this case, this case presents issues that are critically significant to the captive insurance industry. Most notably, the court's decision in this case will be the first decision by any circuit court to analyze key issues with respect to a captive insurer's risk distribution through reinsurance arrangements and participation in a risk pool. Whether a transaction constitutes insurance is a question of law. Review de novo. Preliminarily, just a question, since you're talking about standard review. Two instances. In the tax court ruling, it says that the facts and circumstance indicate that Reserve did not intend to enter a quota share arrangement, intending to distribute the risk. And elsewhere, it says that the facts don't reflect Peek had a genuine need for acquiring additional insurance during the tax years in question. Do we review that for clear error? Is that a fact finding? Your Honor, I believe that the appropriate standard of review is, give me one second. We cited a case in the brief concerning the standard of review that we believe is appropriate. If the findings are reviewed at all in this case, they should be reviewed for harmless error, not clear error, because they were based on an erroneous view of the law governing risk distribution. And we cited Valley Improvement Association versus U.S. Fidelity and Guarantee Corp. Under the correct view, the only reasonable conclusion the court could have reached is that Reserve distributed risk. Under the circumstances of this case, it cannot be said that the court legal error was harmless. So we would say that it's harmless error, not clear error, Your Honor. If I may, Mr. Albart, we're at a pause. Could I ask another threshold question? It may be a fairly basic one, but what is the predicate for venue in the 10th Circuit? I mean, what in the record establishes this as being the appropriate place for the action to be brought? Your Honor, Reserve, the appellant in this case, is a foreign corporation, and venue for appeal, or venue for appeal is dependent on where Reserve should have filed its tax return for the year. Should have or did? Well, they did file a tax return, a Form 990, but the commissioner argued that Reserve should have filed a different type of return. But venue would be with the 10th Circuit because the return would be filed with the service center in Ogden, Utah, which is in the 10th Circuit. Okay, so a return was filed in Ogden, Utah, whether the right kind of return or not. Is that correct? That's correct, Your Honor. Okay. Let me ask you some factual questions. There's some law involved in this, but isn't one of the key, perhaps the key issue here, whether pull-ray distributed risk, isn't that the real question? Your Honor, I'd say that the key issue is whether Reserve distributed risk, not whether pull-ray redistributed risk. Because risk distribution is determined from the perspective of the insurer. In this case, that would be Reserve. Okay, so whether pull-ray distributed risk by having part of the premiums go to pull-ray and then re-insuring, Reserve distributed risk by re-insuring risk with pull-ray. Is that fair to say? That's correct, Your Honor. Okay. So it was legitimate for the commissioner not necessarily to take at face value that pull-ray was distributing risk. It can look at the facts behind that, can it not? Yes, Your Honor. Now, am I correct that the two owners, Zumbaum and Weichel, each owned 50% of peak and 50% of the two affiliated insureds and 50% each of Reserve itself? Is that correct? Yes, Your Honor. Actually, there's an entity between Zumbaum and Weichel that owned Reserve 100%, but they each owned 50% in that entity. Okay. So in terms of their wealth, the more that peak paid in insurance premiums to Reserve, the greater their wealth in this situation. Isn't that correct? No, Your Honor. The premiums would go from peak, which is commonly owned by Zumbaum and Weichel, would go over to Reserve. So essentially, the wealth of Zumbaum and Weichel wouldn't be changed. Well, except that the premium is deductible. Well, yes, Your Honor. So the tax paid by peak is reduced by deduction for the premiums paid to Reserve. Is that correct? Actually, Your Honor, I believe peak is a subchapter S corporation, but the income of peak is reported by Zumbaum and Weichel. Okay. So in fact, their wealth is increased. They're better off financially, and their net worth is increased the more that peak paid in premiums to Reserve. Well, to the extent that Reserve... I'm sorry. As a result of the tax consequences. As a result of the tax consequence, yes, Your Honor. Judge Holmes, you had a question? I think it's been clarified. I mean, there is a tax benefit in the sense of tax deductions by peaks payments to Reserve. And in fact, here, to the extent that Reserve is deemed to be receiving, there's a question of the tax status of the payments that Reserve gets. Is that not correct? There is in this case, Your Honor. Yeah. Yes. Okay. So in other words, there's a potential for two benefits, right? I mean, there's the benefit for the tax deduction of the premiums, and there's the benefit as to whether Reserve is actually getting income that it can claim to be non-taxable income, or whether in fact, its income is taxed at, I think, a 30% rate, right? Well, if the court were to find that, if it were found that Reserve was an insurance company for tax purposes, its income, as long as the premiums are under $600,000 a year, the gross premiums, then it would be tax exempt under 501 C-15 of the Internal Revenue Service. That's correct. And so, and I mean, by this line of questioning, I'm not suggesting there's anything wrong with this. I'm just trying to understand the flow of benefits here. And so there's a potential, really, for the two benefits, the one being the actual deductions that he would be getting by virtue of paying the premiums, assuming all of this is appropriate, and the benefit of taxable money that Reserve would be getting, right? But to the extent that there were any distributions out of Reserve, those distributions would be taxed as dividends to the extent that there were earnings and profits in Reserve. Okay. Were there distributions from Reserve? There were no distributions in the tax years at issue. There was a payment of a claim, but no distributions, no dividends. One claim, right? And that was the one that had checks signed by Peak? That's correct. And then you also had the losses that were paid under the coinsurance arrangement. So how were the premiums calculated for these policies that Reserve issued to Peak and the other two affiliates? Am I correct that all McNeil did was look at what Capstone policies, look at other Capstone policies and sort of said, okay, this is pretty much what Capstone has to premium on that basis. Is that correct? The process of setting the premiums was actually based on premium indications that were provided by MidContinent, which is a large insurance brokerage firm that's affiliated somehow with Lloyd's of London. And so for each insured, there was a premium indication that was prepared by MidContinent and provided to Capstone. And then McNeil would review all that information that had been provided, but the premiums were essentially set, or they were set based on what the advice that was received from MidContinent with the approval of the owners of the captive insurance company, with the approval of Reserve. Well, that's a little vague. McNeil testified that he didn't rely on the Lloyd's indications. Am I correct about that? I believe he said that there was no instance. My recollection is that he said there was no instance where the premiums were higher than what was provided in the MidContinent premium indications. Well, I don't think that's fully accurate. The indications from Lloyd were Exhibit 109P, and he was asked, and so did Exhibit 109P have anything to do with the numbers that are in Exhibit 113, 112P? And he said no. And 112P is the figures he gave as recommendations essentially to Reserve, and those recommendations were followed. I think they discounted it 10%, but exactly 10% for each of them. So, his testimony was that the Lloyd's indications had nothing to do with his figures, and he described his figures as going through the capstone policies for all the captive insurers that capstone managed and came up with some figures from that. Is there anything in the record to contradict what I'm saying? Did I miss something? Your Honor, I believe there is, but I'm not in a position to tell you where that is right at the moment. Well, it'd be nice if you could direct our attention to that if you want to supplement with a 29J letter to point that out, but I'm not aware of anything that says that it's in the record. The record is McNeil's testimony, and he said he based it on capstone insurers, and we don't know whether those insurers were insuring entities, anything like peak or anything like that. Your Honor, I'll be happy to supplement that with a 29J letter. Can I back you up to something you said earlier since you're running out of time? Are you saying that it doesn't matter whether Poole Re is an insurance company? That's correct, Your Honor. How do you say that when Section 816, in considering whether or not Reserve is an insurance company, looks to whether it's reinsuring the risk underwritten by an insurance company, and that would be Poole Re, at least for some of this, right? Your Honor, the case of actually Treganilin from the Second Circuit held that there was insurance where there was no insurance company and there was no formal insurance policy. Also, insurance essentially includes reinsurance, so that section that you're citing, it says insurance or reinsurance, but insurance includes reinsurance. Well, it says reinsuring of risk underwritten by insurance companies. Yes, Your Honor, but it also says that before you get to that last clause of that statute, it says during the tax year is the issuing of insurance, and included in insurance is reinsurance. Reinsurance is insurance. Ocean Drilling, an exploration company, says that, Your Honor, cited in our brief. So the rest of that sentence is just surplusage, where it says for the reinsuring of risks underwritten by insurance companies? Well, here we're talking about whether reserves satisfied risk distribution. That the court, the tax court found that there was no risk distribution because Poole Re was not a bona fide insurance company. And, Your Honor, it's our position that the court did not have to determine whether Poole Re was a bona fide insurance company for purposes of determining whether there is risk distribution present in these arrangements. Thank you. I know your time has expired, but I'm afraid I have a few more questions, so we're going to go a bit over, and my colleagues may have other questions also. Explain to me why PEEC would pay $400,000 a year for insurance that would cover it for a million dollars. That means it expects a loss every couple years? That's an awfully large premium to pay for that coverage. Can you explain why that was a reasonable thing to do, except for the very favorable tax consequences? Your Honor, I'm not a pricing expert, but there were pricing experts who looked at these premiums that were paid and determined those, and that was the going rate for that coverage at that time. The question here is whether we're going to, it seems to me that, as Judge Phillips said at the outset, a lot of these issues are factual findings or ultimate factual finding by the tax court. And the question is whether there's evidence to support that. And when we don't have any good indication of how these premiums were arrived at, and they turn out to be very high for the coverage that they're expecting to get, then the judge of the tax court could reasonably find that this is not a legitimate, this is not a reasonable arrangement. So for you to just say, a tax expert said this is asking us to ignore all the evidence suggesting that these weren't really legitimate tax experts or insurance experts arriving at legitimate premiums. So I'm trying to ask if you can justify this as a factual matter. If we're going to say, oh, experts came up with this, so that's legitimate, then game over, you win. But I don't think the tax court's limited to that approach. Can you give anything to support this? Your Honor, the only way that we could establish the amount of the premiums as being reasonable in amount would be through the testimony of actuaries or evidence presented by someone who is an expert in pricing these kind of policies. And there was testimony reportedly for that purpose at the tax court proceedings. And all we had was McNeil saying, I looked at the other captive insurers managed by Capstone that had similar policies, and this is how we came up with the rate based on what Capstone had suggested for other policies without any discussion of whether those companies were like Peak or anything like that, which makes it very hard for someone to just say, well, of course, experts came up with this. This must be right. Well, there were two independent actuaries who also testified at the trial about the amount of the premiums. Well, they didn't look at anything specific about the cases here, the policies here, the situation involving Peak. They said the process of comparing the various Capstone entities was, I guess, a mathematically proper way of doing it. But there was nothing from these other witnesses in which they assessed risk themselves. But let me pursue it a little further. What about the percent of the premium that would go to PULRE for the stop loss coverage? How was that arrived at? That was arrived at by input from two actuarial firms. The first one was Myron Scholes, I believe, an insurance brokerage firm that made the determination of the split between the stop loss contract and the direct insurance contract. And then there was another actuary who looked at that, Glixman. I think it was Glixman. All they did is say, we're going to use the same percentage of premiums for every captive insurer involved with PULRE through Capstone. Isn't that right? The same percentage for everything without any examination of the risks, without any examination of why it should be 19.5% or 18.5% of the total premium should go to this stop loss coverage, which the way it was structured, it would be very remarkable for there ever to be a loss under the stop loss coverage. And those experts said nothing about those factors. Well, but, Your Honor, I'm not sure that's exactly correct, because if there had been another loss of $110,000 per peak in the year that they had the loss where the claim was paid, then the stop loss arrangement would have kicked in. Also, if the pandemic... Wait, wait, wait, wait, wait, wait. It also had to exceed the premiums for the year. If there's another $110,000 loss, that totals 220, which is less than 400,000, which is less than the premium. So the stop loss coverage would not have gone into operation in that circumstance. I mean, you have risks that had never occurred before. You go three years and there's never any claim by any of these 50 affiliated companies with 130 insurance policies. There's not one claim under the stop loss coverage for any of those people in the three years that we have records of. So that in itself suggests that it's unlikely, but just the way it's structured, it's so unlikely, isn't it? And the people you talk about who said this gave no explanation. They didn't look at the risk at all. Well, Your Honor, the stop loss coverage is not designed to... It's designed to pay basically catastrophic losses or extreme losses. And in this case, you really wouldn't expect these policies to kick in in a short period of time. It would be more like a... Maybe you would have a loss that would be covered in a long period of time. What's absent from the record is anything in the record showing that these things were examined by anyone to see what was going on. And it's very interesting that the 18.5% was perfect for getting 15% of the premiums going to Pool Ray, 15% of the total, which when added to the credit insurance, the vehicle insurance policies, gets you the 30% that you feel is the minimum required for risk distribution. It raises questions. You may be absolutely right, but there's not the evidence in the record to support it. And our question is whether it was improper for the tax court judge to be totally skeptical that this was really a risk distribution arrangement. Well, Your Honor, I'd point out that the tax court actually addressed whether Pool Ray was a bona fide insurance company. It didn't actually address whether from the perspective of Reserve, whether it had achieved risk distribution. It said that Reserve had not achieved risk distribution because Pool Ray was not a bona fide insurance company. Well, it said Pool Ray didn't distribute risk. Did it not also say that? That Pool Ray was not, I mean, that Pool Ray was not involved in handling risk. The risks were so infinitesimal that that was not, I can't remember the exact language. Let me check that. Didn't the tax court say that Reserve was not distributing risk among its own affiliates though? That Reserve, it did say that, yes, Your Honor. But the reason for that point was that there were only three insureds, and three insureds is typically not considered to be enough to achieve risk distribution. Focusing on the 30% threshold that plays out in your brief in particular, but also I think in the government's, if we were to find that either the credit co-insurance arrangement or the arrangement, the quota share arrangement, either one of those was in some sense defective, then that eliminates your ability, Reserve's ability to establish risk distribution. Is that correct? We wouldn't meet the 30% percentage that we said we met. Okay. And following up on Judge Hart's line of questions about the stop-loss arrangement, I noted in your reply brief the comment about stop-loss arrangements being related to extraordinary, catastrophic, I think was the word you used, circumstances. Was there testimony to that effect? I mean, what is the predicate for that view such that a three-year period where there were no paid losses should not cause us to view that with some skepticism? In other words, what's the factual foundation for that statement that this sort of arrangement is only for catastrophic circumstances? Well, again, off the top of my head, I'm not sure that I can cite a chapter and verse on that. Well, I mean, was there anybody who testified about it? I mean, right now I'm not asking for specific page numbers. I'm just asking for what would be the category of evidence in the record that would support that predicate? I mean, you cited it in your reply, so presumably maybe there's something there. I'll go back and look, but what category of evidence best supports that premise? I believe there was testimony. My recollection is that there was testimony from Stuart Feldman, and there was also testimony from one of the other witnesses about that. And then there were the letters that were in the record from Myron Scholes, and the other was the Glixman letter. Let me ask you, what sort of catastrophe we're talking about here anyway? The policies were for a million dollars with reserve. The stop-loss coverage, the maximum that Poll Ray would have to pay under stop-loss coverage was less than a million dollars, wasn't it? I believe that's right, Your Honor. Something like 700,000, something like that? One and a half, 150% of the premiums, something like that? I believe it varied from 2008, 2009, and 2010. Let me ask you a few more specific questions. One on the vehicle service contracts. I don't have much to ask about that, but did reserve have the right to see the underlying vehicle service contracts that originated with credit reassurance? There appears to have been a dispute about that in text. Did reserve have the right to see the contracts? These were treaty insurance arrangements as opposed to facultative insurance arrangements, and so reserve didn't typically have the underlying vehicle service contracts, which would have been literally thousands of contracts. My question wasn't whether they would want to exercise that right, but did they have that right? Your Honor, Poll Ray or somebody in the chain may have had the right to audit the underlying contracts or the underlying risk and payment of losses. When Poll Ray first entered into these contracts, was it for the 19... Let me start over. For the 2008 policies, was Poll Ray a licensed insurance company at that time? It was not. Well, Your Honor, there's no evidence in the record to show that it was licensed in 2008. Our position is that Poll Ray wouldn't need to be a licensed insurance company for reserve to achieve risk distribution. When did it become a licensed insurance company? I believe the record shows that it was licensed after the first year. After the first year that it was issued. Sometime in 2009? In 2009, Your Honor. Now, there was one claim on reserve, and that was loss of a customer. That was a very interesting claim because the date of loss in the claim is early January of 2009, which is less than a month after the first policy, the 2008 policy, and only a few days into the 2009 policy. Is there anything in the record showing any investigation to determine the legitimacy of that claim by reserve? Your Honor, there's some documentation. There were some exhibits that related to the review of the claim that are in the record. Do those show why the customer quit? Because that's relevant to whether there's coverage under the policy. Is there any documentation of why the customer quit? I do not recall whether there is documentation as to why the customer quit. Is there any documentation of whether Pete tried to get a replacement customer, which is required under the policy? I don't believe there's any testimony to that effect in the record, or I don't recall that. Is there anything in the record to show whether Pete had some notice before the policy period that this customer was going to be quitting? I believe it was a drop in sales, Your Honor. That's my recollection. I don't think it was a, I don't think they actually lost the customer. I think it was a drop in the sales that triggered the payment under the policy. Why did reserve change the policies it had from year to year? I thought that was interesting. What would, is there anything to show why they dropped certain coverages? Or change the amount of coverage? Well, every year the, and I'm going to answer your question, but every year the coverage would be reviewed by Capstone, and a decision would be made as to what coverages were going to be provided for that year. Whether or not there's actually anything in the record that explains every change as to why there's a change in the coverage, I'm not sure there's a lot of detail on that in the record, Your Honor. There's nothing in the record that I found, but maybe I missed something. Let me ask a little bit about premium rates also. There are a couple things that are mentioned in the record, so you should be aware of these in the record. One was the regulatory changes policy, and the premium for one month coverage at the end of 2008 was $64,899 for a $1 million coverage. For the next year, two years, the that seems like a real discrepancy. Why did the premium, how do you explain that one month of $1 million coverage would cost, I don't know, a third more than a year coverage for half a million dollars? Your Honor, I don't believe there's an explanation for that in the record. The pricing of the insurance was based on the premium indications that were provided by MidContinent, and that's a question that they would have had to answer. Well, let me give you what I think is the reason. In these documents that Mr. McNeil prepared, when it shows regulatory changes coverage, he has a column that shows the annual premium for the $1 million coverage should be $71,910. This is Appendix 3776, if you have it available. And then it's prorated. Some of these policies went back a couple years. Some just covered the December of 2008. This was a policy that just covered one month, but he put down prorated 95% as if it was to cover 11 months. So that's a $60,000 error in the premium, and no one seemed to care. No one checked this. Does that strike you as peculiar? It certainly strikes me as an error, Your Honor. Yeah, big error. What about the error on the excess director's and officer's liability in that policy? If you look at that policy, it covered nothing because all that coverage is based on claims relating to certain insured persons. And the policy says the insured persons are only those listed in, I don't know, Attachment A or something, and there's no one listed on Attachment A. So that policy covered nothing. Your Honor, I would suggest that that policy did actually cover something. It was missing Exhibit A. No, there was an Exhibit A. It just didn't have anybody listed on it. It's just an error.  I have two more questions. Let's see. Just one. This has to do with, hold on a second. I'm going through my notes so I don't miss something. Okay. The tax court made two findings, and I'd like to see how you interpret this, maybe reconcile them. It said that Capstone used actuarial methods and objective criteria, but the premiums were unreasonable. How do you understand that statement by the tax court? I'm going to ask the government that, too. Your Honor, I believe that the tax court is just looking at the amount of the premiums, and they're saying that the tax court's observing that actuarial methods were used to determine the premiums, but the tax court is concluding that the premiums are unreasonable in amount, which we do not agree with, Your Honor. I'm just trying to understand how they could be unreasonable if they use actuarial methods and objective criteria. I don't have a good answer for that, Your Honor. My last question or questions relate to your alternative position that if we affirm the tax court's determination that there was not a distribution of risk, so reserve is not entitled to be treated as an insurance company, that you're saying then the money that went from peak to reserve should be treated as a contribution. To justify it being treated as a capital contribution, doesn't that depend on the intent of peak in making the payment? Is that relevant? Intent is relevant, Your Honor. I agree with that. And so if peak's intent was that this was a capital contribution, then does that mean that peak filed a fraudulent return when it said this was for payment of insurance premiums? No, Your Honor. Why not? How can they have the intent to make a capital contribution and still say, no, I was paying insurance premium? Your Honor, it was peak's intent to pay an insurance premium. Peak intended to pay an insurance premium. The tax court, however, has held that there was no business purpose for making that payment. And if there's no business purpose, then that means that peak didn't get anything in return for making that payment. If there's no business purpose, it means that under authorities that there's a revenue ruling where you have commonly owned entities making payments between them that rules that that's a distribution to the shareholder and then a contribution down to the recipient of that payment, then it's inconsistent to say that that's income to the recipient of the payment. But that's, in other words, you're saying that the intent of peak is irrelevant in this circumstance? It was actually, that was what peak said. Its intent was to pay an insurance premium, but the tax court said, I don't buy that. It was not an insurance premium. And so, you've got a transfer of funds from one corporate entity to another corporate entity, and there's no business purpose for that payment, then peak shouldn't have income. It would be a distribution to the shareholder and then a contribution down to the reserve. And it wouldn't be a taxable, it wouldn't be taxable. Is the business purpose analysis an objective test? Is the business purpose an objective test? I mean, it is not inconsistent to say that peak had the intent to pay insurance premiums, but the tax court determined there was no objective business purpose for that payment. Now, so in other words, if the court were to hold that there was no objective business purpose for it, that would mean that you could still make an argument that peak had the intent to pay premiums or, but I need to understand what's the basis for that, the determination of business purpose is that I would assume that it's based on evidence and objective facts, right? It's based on the evidence, your honor. The tax court said that there was no business purpose for peak making these payments. They actually went further than that and said that the only purpose for the payments under the quota share arrangement was to shift income from peak to the insurance company. And that would be the effect of the quota share arrangement. The objective effect of it, that would be what the only purpose for it according to the tax court was that it was to shift income from peak to reserve. I guess what I was trying to get at is that going back to Judge Hart's line of inquiry, if you're saying that when peak filed its return, that it intended to pay premiums, then irrespective of what the tax court does with the business purpose, if the business purpose test is objective, irrespective of what it does with that, peak is stuck with the intent that it made in making the payments as premiums. In other words, as a consequence of that, it is stuck with that intent. And as a consequence of that, there cannot be, it cannot be deemed capital contributions because that was not peak's intent, irrespective of what the tax court did on the business purpose itself for the payments. That's why I'm trying to get at it because it's, because it is not inconsistent to say that although peak may have sought to pay premiums, it objectively did not. They did not have that effect. They were not the business purpose. Consequently, peak would be stuck with the intent that it claimed when it filed its tax returns, that it was paying premiums. And as a consequence, there would not be capital contributions, right? Your Honor, I believe that some of the case law that we cited in the brief on this point would suggest that the amounts would be treated as a capital contribution. There's several cases, Carnation, Chapman Glen, Gulf Oil, Revenue Ruling 7883. And that would be why, because I thought you agreed with Judge Hart that the peak's intent was not only relevant, I think it's going to, wouldn't peak's intent be determinative? I mean, if peak intended to pay premiums, that intent governs, does it not? Well, I don't think that's entirely true, Your Honor. There's, the case law underlying Revenue Ruling 7883, there's a case in there where I believe somebody was renting something and the court said, the court found that the rentals that were paid were too high and characterized the excess as being a distribution to the owner and then a contribution down to the recipient of the payment. Okay. And in that particular case, what was the court's characterization of the intent of the donor? And how did the donor play out? In the intent of the donor is just, it's really one factor. The courts actually look at the substance of the transaction to determine whether or not the amount is indeed income. That's the way I read the case law, Your Honor. Any further questions from other members of the panel? Okay. Thank you, Mr. Albright. We went well over your time. I know you wanted to reserve some time for rebuttal. I'll give you at least a minute. We'll see what happens, but you will pay attention to what Mr. Klimas says, because you'll have a chance to respond, although maybe very briefly. Thank you, Your Honor. Mr. Klimas. May it please the court, Jeff Klimas for the Commissioner. The tax court correctly determined that Reserve Mechanical was not a tax-exempt insurance company for three reasons, any of which provides a sufficient basis to affirm the decision below. First, Reserve did not achieve risk distribution through the quota share arrangement in which participating insureds were far removed from the risks of unaffiliated parties. Second, Reserve did not achieve risk distribution through the credit coinsurance arrangement, which it failed to prove even existed. And third, Reserve's arrangements did not constitute insurance in the commonly accepted sense where the arrangements did not satisfy a genuine need for coverage, the single claim that was paid was handled and processed in an irregular manner, and no one with financial interest in the company conducted any oversight or due diligence. The tax court further correctly determined that payments reported by Reserve as income were in fact income, where Reserve produced no evidence to demonstrate that they were intended as non-taxable capital contributions. Turning first to the issue of risk distribution, courts including the Ninth Circuit in Americo and the Federal Circuit in Ocean Drilling have consistently held that there's no insurance arrangement and no risk distribution if the risk transferred by the insured and the risk ultimately shouldered by the insured are virtually the same. If as a matter of economic reality, every dollar paid by a captive came from the parent's own pocket, and that essentially risk shifting and risk distribution on the same are two sides of the same coin in that aspect. There are two arrangements through which Reserve attempted to achieve a total risk distribution of over 30%, the quota share arrangement and the credit co-insurance arrangement, but the tax court certainly did not clearly err in finding that neither of those actually achieved risk distribution. The key finding that the tax court made as it pertained to the quota share arrangement was that Pool Ray was far removed from the actual risk of the participating insureds, where none of the insureds had a history of the type of losses that were covered by the policies. There was no demonstrated need for them to take on such coverage, and the coverage thresholds that were set off and set out in the stop-loss policies, the attachment coins and the dollar amount thresholds, were designed to ensure, and as a factual matter did ensure, that those stop-loss coverages would never kick in and therefore no insurer, no insurer, no captive insurer would ever be responsible for paying the losses incurred by an unaffiliated insurer. What's your response to the idea, in reply brief, that stop-loss insurance is designed by definition to address catastrophic losses and therefore the fact that there was no payment within this three years should not raise any eyebrows at all? Well initially, even if we don't want to limit ourselves to the three years that were incurred, no losses that would have been covered by these policies. We do take some issue with calling these catastrophic risk policies. A lot of these policies seem like run-of-the-mill type of policies, intellectual property, public relations expense reimbursements, tax deficiency policies. I'm talking about the stop-loss arrangement itself. You set the premise that this sort of arrangement, by its nature, is designed to address catastrophic losses. But certainly that's the way that this stop-loss policy is structured, that it's only going to kick in if there are multiple high dollar amount losses. I don't know that that's necessarily true in every stop-loss policy that could kick in at lower thresholds, but certainly these policies were designed only to kick in if, in the very unlikely scenario where you had unusual covered losses, multiple unusual covered losses, and those were all high dollar amounts as well, which had never happened historically and certainly did not occur in the years at issue. Notwithstanding the fact that there were a number of insurers, 50 insurers, and over 100, 150 policies that were covered, that no one was ever making a claim under the stop-loss policies. And there was no indication that would have occurred even if we would extend the reporting period out for several years more. There's also the fact that the way that these were priced is, you know, PEAT was paying $400,000, $500,000 a year for, you know, the privilege of almost always, you know, absent some catastrophic events, for the privilege of being able to self-insure and cover its own losses. And it's only if you had some really truly catastrophic scenario that you would actually kick in and get $450,000, $500,000 of coverage after PEAT had already covered the first $400,000, $500,000 of losses on its own. Just a scenario that's not likely and not commercially feasible or reasonable, particularly given the fact that there was no evidence submitted that PEAT actually had a need for the type of coverages that it was taking on. Not based on prior loss history, not based on the industry that it was in, no analysis to show that these were appropriate coverages either in dollar amounts or in premium prices for PEAT specifically. Notwithstanding Capstone's representation that it was designing coverage with a scalpel, that this was specialty coverage, that this was coverage that was not commercially available, when in fact several of these lines were commercially available, but PEAT had never attempted, and never attempted to the best of our much less priced out what those policies would look like. Excuse me, what does the record show about the availability of this sort of coverage from normal commercial insurers? That wasn't clear to me. That may be true, but I don't know how you, what in the record supports that? There was testimony from one of reserve's experts that several of these lines of coverage were commercially available. Tax coverage, intellectual property coverage, several of those types of coverage. So, this was from one of reserve's expert witnesses that said several of these coverages were commercially available. Do you recall who that was? I do not, your honor. I know that we cite that in our brief, but I can't remember which of the experts said this was commercially available. What about pollution? That seems like the natural as far as a catastrophe. Certainly the, probably the best argument that it was providing that it was fulfilling a genuine need, but there is no evidence that PEAT actually tried to obtain pollution insurance from the commercial marketplace. Mr. Zumbong testified that he didn't believe they could get pollution coverage, that he wasn't aware of anyone that offered coverage in his state, but there's no actual evidence that they tried to secure such coverage. Is there anything in the record that, in fact, pollution is offered commercially? I've seen cases, but I don't know about your record on that point. There is some limited pollution coverage that was available under PEAT's commercial policies. It was limited, but they did have some pollution coverage that was covered within their commercial policies, but there was no evidence, but in one way or the other, about whether they could have obtained additional pollution coverage through the commercial marketplace. And in their replies, reserve says that you do not, you being the commissioner, does not dispute the assertion that the court misread the direct written policies as providing only excess insurance. Is that, in fact, correct, that you agree with that contention, that the court misunderstood or misread those direct written policies as only covering excess insurance? No, Your Honor. The policies on their face say that they are excess coverage only, that if there is other insurance that is available, that has to be used up and exhausted before the supplemental insurance would kick in, or at least would have to concurrently kick in alongside these captive arrangements. And we give the example of the pollution coverage that is available under PEAT's commercial policies, that if there was a pollution claim that might be covered by the commercial policies, might also be covered by the supplemental policies, and whether that is being covered first by the commercial policy and then by the captive policies, or whether it's being covered dollar for dollar concurrently, it is an additional barrier that would make it less likely that the captive policies and the stop loss coverage would actually kick in, and you have a situation in which insured had to bear or shoulder the cost of an unaffiliated insurance loss. You said it's a situation where it would be covered concurrently, dollar for dollar. Well, in that situation, is it really, I mean, does that fit the definition of excess insurance in a situation where the reserve would be called upon in that situation to pay dollar for dollar as it relates to these affiliates? I mean, the terminology that's used in the policies that were issued by reserve is excess coverage, excess coverage clause. That's the language that's used. Now, if you have a commercial policy that covers that same risk as the captive policy, you might end up in a situation where there's a dollar loss, 50 cents goes to the commercial carrier, 50 cents goes to the captive insurer. But that's still considered excess coverage in the sense that those contracts use the term. I don't think there's anything erroneous about the tax court referring to these as excess coverage policies, given that that's the exact language that's used in the policies themselves. Okay. And I think the point was being made to suggest that the premiums that were being charged were not that unreasonable if one views reserve as being called upon to actually pay in a basis that did not involve a high threshold of being an excess carrier. So, I mean, as it relates to the whole premise of the reasonableness of the premiums that were paid, what is your thought on that? We would suggest that as an initial matter, reserve failed to introduce any evidence to show that these policies were commercially reasonable. They only introduced evidence to show that they were reasonable as compared to other capstone policies. But to the more specific point, these policies were designed to ensure that the captives and reserves specifically would be shouldering the losses of their affiliated insureds and not third parties. Were designed so that this was effectively a self-insurance arrangement. And to have the privilege of self-insurance is not something that entities generally would be willing to pay $400,000, $500,000 a year for, when the only real benefit of having an outside insurer kick in any money at all is if there's an unusual confluence of multiple unlikely losses for which is no historical precedent and of a significant dollar amount after reserve, using peaks own funds, has already paid the first $400,000, $500,000, $600,000 of that claim on its own. That's not a commercially reasonable decision in terms of business judgment and use of funds to buy that level of coverage that is just simply unlikely to ever shift risk someone other than reserve to ever use someone's money other than peaks. Let me ask you about the vehicle service contracts. Why is it so important that reserve show the court, produced for the court, the underlying vehicle service contracts? And why do you think that reserve actually had the authority to do that? To get those underlying contracts? So reserve, as a contractual matter, had the right to obtain any documents that Pool Ray had with respect to arrangements in which it was involved. That contractual arrangement is set out at 3264, 3404, 3537 of the appendix. What I think the tax court was concerned about... What you said was reserve had the right to see anything that Pool Ray did. Then you have to show that Pool Ray had the right to see those documents. Do we know why that was the case? I'm not sure whether Pool Ray had those contracts or had the right to see them, although there are other documents that presumably Pool Ray would have had to that were not offered in evidence. Other documents that reserve should have had that were not offered in evidence. The vehicle service contracts are one example of documents that were not put into evidence to support the existence of these co-insurance arrangements. We're certainly not the only documents that were missing from the record. You started to say, what was it that the tax court was really looking for? The tax court was really looking to see whether this was a legitimate arrangement that actually existed. For example, certainly Pool Ray should have had a copy of the contract by which the risks were seeded from credit rates Pool Ray, and reserve would have had a right to obtain that contract. That contract was not put into evidence. Well, there's testimony about thousands of contracts. Was the tax court trying to determine what share, as it filtered down the staircase between being seeded from one entity to another, what share were actually in place so that it could measure the risk? I think that the court may have had concerns that it needed to look behind the curtain and see whether these were real risks. What was the likelihood of these risks? What kind of risks were involved? And one way to do that would be to look at the underlying contracts, but we don't even have all the seeding arrangements. We don't have the seeding arrangement that transfers the risk from credit rate to Pool Ray. Presumably, there would have been documents that reserve would have received saying what its losses in a particular year were under the arrangement, so it would know what to pay. But there's no invoices, no emails, no traffic showing those dots, that information. There should also be not only accounting entries, ledger entries showing these amounts being paid and funds being transferred. There should be actual bank documents showing the transfer of funds, which are just not in the record either. There should be something that shows that reserve's bank account goes up or down when there's a payment of premiums or the incurring of losses. Those are also missing and absent from the record. And I think that the tax court was rightly concerned to say, why are we having people testify about what these transactions look like and how they work, instead of seeing the documents that establish that and prove that? And we would suggest that the tax court was appropriately concerned and that there are evidentiary gaps that have not been explained. I'd also like to ask you about the concern with the circular flow of premiums. That strikes me as not wrong in itself, that you could pull a lot of different insurance companies and they would share each other's risk by pooling in a circumstance in which, if there were no claims, each company would get back in reinsurance premiums paid to it, the same amount it was paying into the pool. What's wrong with that arrangement? Maybe there's a problem here because there were never any claims, but why is that arrangement inappropriate? That's something raised by the amicus and it struck me as a reasonable concern. Yes, Your Honor, there's nothing that... The commissioner is obviously not taking the position that anytime you have perfect matching between premiums paid to the soft loss carrier and reinsurance premiums paid back to the captive insurer, that that is per se invalid. It can happen, it does happen, and sometimes happens legitimately. But when you look at all the facts and circumstances, if you have perfect matching of those payments without evidence as to why it's occurring, without testimony as to why it's being set up that way, and then you factor in the fact that this is coverage that is just extraordinarily unlikely to ever be triggered based on the lack of historical losses in these categories, based on no demonstrated need for this particular type of coverage, the high thresholds and attachment points for the coverage to actually kick in, and the high premiums that are being charged for such coverage, when you stack all those facts together, you end up with an arrangement that you would say, this doesn't look like a real insurance arrangement, doesn't look like real risk distribution. But if you were just looking at that one factor, certainly I don't think that we would be here, that this wasn't a situation where the IRS said, perfect matching of these two sets of premiums, therefore not insurance. That was one of the factors that it looked at in conjunction with other factors, but certainly not dispositive in its own right. I also, one day asked you, and I missed closing council earlier, about the tax court's finding that Capstone used actuarial methods and objective criteria. To me, that would seem to make for reasonable premiums. But the court said that Capstone used actuarial methods and objective criteria, but the premiums were unreasonable. How can you use actuarial methods and objective criteria and still have unreasonable premiums? Can you reconcile those two statements by the court? Okay, yes, your honor. I mean, you can use actuarial methods to come up with premiums that are unreasonable. You could design them that way. You could say, well, here's the likelihood that we would actually have a covered loss. Let's charge premiums that are well in excess of that. We can calculate what the risk is and then come up with a pricing methodology that is going to way overestimate that risk or way overprice that risk, even if you're using actuarial methods. I presume that Capstone and Poole Ray knew that this was a really, really low instance of risk, a really, really low likelihood of risk, but they didn't price it that way. They priced this at really high rates for these reportedly catastrophic hundred-year storm events, but they were still charging really through the nose for these unlikely scenarios to occur. You can use actuarial methods to come up with inflated figures. You just have to play with those in different ways. You're using objective criteria like multiplying by number of employees or gross revenue, but if you're using the wrong multipliers and you're intentionally doing so, you can end up with a result that is really skewed, and we would say the tax court correctly found so here. Excuse me. Sorry. Well, the actuarial method was to look at Capstone policies or policies from other captive insurers that were managed by Capstone. Is that correct? I think that's what the court said, and that's what the record seems to say. Is that correct? Certainly, that's what the actuaries at trial testified to. They looked at whether these were reasonable in relation to other Capstone policies. I think that Mr. McNeil talked about pricing indications and internal pricing guidelines, as well as subjective underwriting judgment, but there was no attempt to show that these were commercially reasonable policies or to link them up with these specific risks incurred in this particular industry or geographic location. They were just multiplying out based on number of employees or gross revenue without these specific indications based on these unique situations. If the tax court judge thought that what was being done was looking at Capstone policies and doing it the way you've described, the court would have called that using actuarial methods and objective criteria? Yes, your honor. I mean, if you take number of employees, gross revenue, other inputs, and then you multiply that by a particular percentage, that's an actuarial method, but if you're using the wrong multiplier, it doesn't make it a valid actuarial basis for determining the premiums. Let me ask you about the capital contribution issue. Um, it's too late to go after peak for deducting the cost of the premiums, I assume. Is that correct? Yes, your honor. Is there a legal doctrine that says in that circumstance when you can't get over, you recharacterize the payments made to the recipient for purposes of evaluating the recipient's returns? Is there any doctrine like that? I'm just wondering if the cases that Mr. Albright cited involve situations where you could adjust both returns at the same time. Here you can't. It would seem to me that that would be problematic, but I didn't know if there's any law going one way or the other on that issue. Are you aware of any? I'm not aware of any case law offhand, your honor, but I don't think that the IRS would make a 482 transfer pricing type of adjustment in a situation where it can only adjust the return of one of two parties to say this is excess on one hand, we're going to shift it over to the other party, or we're only going to shift it over to the other party on paper because we can't do it in actuality. I've never seen transfer pricing in 482 applied in that way. It's only applied to make the form of the transaction consistent with the substance, and you can't do that if you're only making adjustments to one side of the ledger. That in any event was not part of the reasoning for refusing to treat this as a capital contribution, is that correct? Not that I'm aware of. This was based on the fact that it was reported as a deduction on one side, reported as income on the other, and it was consistent with this being income. There was no evidence that it was intended as something other than income to reserve, which reported it as such. The Sammons case that's from the Fifth Circuit that both parties cite to talks about how situations like this, subjective intents, must necessarily be used to differentiate between normal business transactions, related corporations, and those transactions designed primarily to benefit the shareholders. That's an intent-based question, and as the party with the burden of proof, reserve had the obligation to come forward with evidence of intent. Objective intent, did you say? Objective intent? In Sammons, they use the terminology of subjective intent. Subjective intent. I thought I heard you say objective intent. Yeah, subjective intent is the question of whether there was any substance to the transaction. That's going to be determined as an objective matter, right? That's correct, Your Honor, and we do disagree with reserve to a certain extent in terms of their reading of the tax court opinion. The tax court did say that there was no business purpose for the insurance policies that were being underwritten by reserve. It did say there was no purpose in shifting the funds through Poole Ray and then back to reserve. But it did not say that there was no business purpose for the funds being shunted from Peak to reserve. It did not make that factual finding. It made other findings, but not the finding that reserve is hammering on and claiming that it made. And in this instance, we think this is actually more similar to Gulf Oil from the Third Circuit, where the tax court, as affirmed by the Third Circuit, said, yeah, we agree that these weren't insurance premiums. We don't think this was a real insurance arrangement. But by having this self-insurance arrangement, moving funds offshore to protect against business losses of the affiliated insureds, that was enough of a business purpose that we're not going to recharacterize these as capital contributions. We're going to leave them at income, which is the way that they were reported by the recipient. Did the tax court opinion suggest that possibility, that it would be proper to characterize this as payments from Peak to reserve to isolate the funds to protect them in case of a loss, even if reserve didn't qualify as an insurance company under the tax code? The tax court didn't go that far. It treated this just as a burden of proof case. It said, this is terms on intent, and reserve has put forth no evidence whatsoever regarding intent. That's enough. It could have gone that extra step further and said, here's what this business purpose is, or this modicum of business purpose, in terms of self-insurance, which is from a real insurance arrangement. But it didn't go that far. Burden of proof, we're looking at intent. As this court's precedent, other courts recognize that the controlling inquiry is one of intent. Without any evidence being offered, we don't even need to go that far. The burden of proof is dispositive in this case. Any other questions from the panel? Thank you, Mr. Klimas. Mr. Albright, I'll give you two minutes if you want to respond to anything from Mr. Klimas. You're apparently muted, Mr. Albright. Your Honor, can you hear me now? Yes. Sorry. You asked both of us, the court asked both of us, whether there was a reason for the court finding that objective methods were used, actuarial methods were used to determine the premiums, but the court nevertheless found that the premiums were unreasonable. Well, it's clear that the tax court misread the insurance policies at issue here. The tax court read the policies as providing only for excess coverage. And... I'm sorry? That language is on the policies themselves. They say this is excess coverage. But there's other language in the policy that is relevant to an interpretation of the policies. That language is quoted in Reserves Briefs. But if you follow through that language, it provides basically that... The tax court found Volume 4, Appendix Volume 4, page 905, the tax court expressly recognized that reserves policies covered only losses that were not covered by the direct insurance third-party commercial policies. So here, when the direct insurance commercial policies and reserves policies covered different risks, the other insurance clause in reserves policies did not apply, so that reserves policies provided primary rather than excess coverage. The court also misread reserves direct written policies as providing only excess coverage. To the extent that there would be any overlap between the two policies, if there was, then the other policies also had an other insurance clause. And the legal effect of those clauses is that if there was a claim to which both sets of policies would act as primary coverage up to their respective coverage limits, and neither would be excess coverage over the other. So the tax court clearly misread the policies. One other point... Very quickly, I'm sorry. Yes, the commissioner said that there was no evidence about the payment of premiums and the general ledger. There's bank records. There's audited financial statements that show that. As far as there being... The court asked opposing counsel, what if there had been a... If the payments had been made from the insured over to the insurance company to set up a mechanism to cover losses that might occur? And your honor, that would be... There would be a business purpose for that. And that would be... The tax court found that there was no business purpose for the arrangement at all. And that would be contrary to that kind of an arrangement. Thank you, counsel. I don't know who's got the siren nearby. Um, well, the case is submitted and counsel are excused.